Golden Motors, Inc., Appellant *v.* Southern Motors Company and Equipment Leasing Authority of Philadelphia and City of Philadelphia, Appellees.

Argued April 9, 1985, before Judges CRAIG and COLINS and Senior Judge KALISH, sitting as a panel of three.

138

*Sol H. Weiss,* with him, *Margaret R. Connors, Anapol, Schwartz, Weiss & Schwartz,* for appellant.

*Patrick J. Broderick,* with him, *Thomas J. Gregory, Broderick & Karaszkiewicz,* for appellee, Southern Motors Company.

OPINION BY JUDGE COLINS, June 13, 1985:

In this appeal we must determine whether Golden Motors, Inc., (Golden) shall be disqualified from submitting bids or otherwise entering into contracts with the Equipment Leasing Authority of Philadelphia (E.L.A.), due to it being partly owned by Salvatore Miluzzo (Miluzzo), a lieutenant in the Philadelphia Fire Department. Appellee, Southern Motors, sought a declaratory judgment that the right of Golden to bid and contract with E.L.A. violates Section 10-102[1] of the Philadelphia Home Rule Charter (Charter). The trial court ruled that Golden did, in fact, violate Section 10-102 of the Charter and enjoined it from further conducting business with the E.L.A. For the reasons hereinafter stated, we affirm.

---

[1] 351 Pa. Code §10.10-102.

Both Golden and Southern are authorized Chrysler automobile dealerships doing business in Philadelphia, Pennsylvania. They are competitors, not only generally, but also in the process of bidding on contracts for the supply of motor vehicles to the City of Philadelphia.

Prior to 1976, the City procured its automobiles directly through its Procurement and Public Property Departments. However, on December 23, 1975, pursuant to the provisions of the Municipalities Authorities Act of 1945,[2] the City authorized the establishment of the E.L.A. On January 9, 1976, the E.L.A. was incorporated, and on August 30, 1976, City Council, in Bill No. 350, authorized the City's Procurement Commissioner, on behalf of the City, to enter into leases with the E.L.A. This Ordinance specified the leasing contract to be used between the City and the E.L.A., and contemplated the use of equipment revenue notes insofar as financing was concerned. On November 21, 1977, this Ordinance was amended by City Council, in Bill No. 996, to make provision for the issuance of equipment revenue bonds by the E.L.A. The new ordinance again spelled out the form of lease to be entered into between the City and the E.L.A. On March 1, 1977, the City and the E.L.A. entered into an "Agreement of Lease".

Under this new system of leasing, equipment acquisition approval and bid specifications would be developed within certain city departments. Bid specifications would then be forwarded to the E.L.A. which would, in turn, contact local banking institutions in order to formulate an agreement as to the amount and type of funding which would be made available to the E.L.A. on a particular procurement. When sufficient funds were pledged by the banking institu-

[2] Act of May 2, 1945, P.L. 382, §1, 53 P.S. §§301-322.

tions, invitations to bid would be sent out to interested suppliers, in this instance automobile dealers, among which was Golden.

Golden was the lowest bidder on a number of invitations to bid promulgated by the E.L.A. Thereafter, Southern alleged that Golden had violated Section 10-102 of the Charter by bidding on, or contracting for, the furnishing of automobiles to E.L.A.

Golden argues that Section 10-102 of the Charter neither applies to it nor to the E.L.A. We disagree.

Section 10-102 provides that: "any City employee . . . whose salary is paid out of the City Treasury shall not benefit from and shall not be interested directly or indirectly in any contract for the purchase of property . . . to be paid for out of the City Treasury. . . ."

In the instant case, the one-half owner of Golden is a City employee who would directly benefit from the subject contracts. Golden will, in effect, be paid by the City of Philadelphia. While the check will not be issued directly from the City Treasury, it would be absurd to conclude that the City is not a party to the transaction, since the E.L.A. is merely a passive financial conduit for the City.

This relationship, between the City and the E.L.A., becomes apparent when we examine the March, 1977, Agreement of Lease.

As summarized by the trial court, the Lease Agreement provides, *inter alia*, that:

>    (a)   the lease rentals are payable by City directly to the lending institution;

>    (b)   City binds itself "to meet all [E.L.A.'s] obligations under the Notes and the Indenture";

>    (c)   City will designate ("will recommend") the type, quantity and supplier of the

equipment, and E.L.A. is relieved of any "liability for any delivery or failure by the supplier to fill the purchase orders or meet the conditions thereof" and, further, City "at its expense will pay all transportation, packing, taxes, duties, testing and other charges in connection with the delivery, installation and use of the Equipment, and all dealer preparation";

(d) E.L.A. is relieved of any "express or implied warranty of any kind whatsoever with respect to the Equipment, including but not limited to: the merchantability . . . fitness for any particular purpose . . . design or condition . . . quality or capacity . . . workmanship . . . compliance . . . with the requirements of any law, rule, specification or contract . . . patent infringement . . . or latent defects" in the equipment leased to City;

(e) "all risk of loss, damage, theft or destruction . . . of Equipment shall be borne by the City", which will also "at its own cost and expense . . . maintain, service and repair all Equipment";

(f) "City shall pay and discharge all license fees, assessments and sales, use, property and other tax or taxes which either City or [E.L.A.] is lawfully obligated to pay";

(g) City "agrees to assume liability for, and . . . agree[s] to indemnify, protect, save and keep harmless [E.L.A.] . . . from and against any and all liabilities (including STRICT LIABILITY IN TORT), obligations, losses, damages, penalties, claims, actions, suits, costs, expenses and disbursements, including legal fees . . . relating to or arising out of this Lease"; [and]

(h) City assumes at least joint liability with E.L.A., on E.L.A.'s liability to the lending institution. . . . (footnotes omitted).[3]

As Judge MARUTANI, of the trial court, correctly noted:

The financial resources of the City are subject to liability at various stages for every obligation and risk incurred by E.L.A. including lease-rental payments made directly to the funding agency that provides the funds to pay the supplier of vehicles; the obligation on the loan (or bonds); the risk of any failure of the supplier to fill the purchase orders or meet the conditions of the order; payment for dealer. (i.e., Golden's) preparation; payment of fees and taxes; indemnification of E.L.A. against "any and all liabilities"; as well as assumption of joint liability with E.L.A. vis-a-vis the lender.[4] (Footnote omitted.)

Finally, Golden argues that since the E.L.A. is derived from the Municipality Authorities Act of 1945, it enjoys the privileges and exemptions accorded to an "independent agency of the Commonwealth", and as such, the restrictive provisions of the Home Rule Charter are not applicable.

As correctly noted by Judge MARUTANI, "[I]n the matter . . . before this Court, it is *not E.L.A., the agency,* against whom the prohibitions of §10-102 are being directed; rather, [it is] . . . directed against a *private entity,* Golden, by reason of a City employee's ownership interest in such entity. . . ."[5]

Therefore, we conclude that the proscriptions set forth in Section 10-102 of the Charter apply to Golden.

---

[3] Trial Court opinion, pages 4-6.

[4] Trial Court opinion, pages 10-11.

[5] Trial Court opinion page 12.

Accordingly, we affirm.

ORDER

AND Now, this 13th day of June, 1985, the order of the Court of Common Pleas of Philadelphia County, dated November 3, 1983, at July Term, 1978, No. 2374, is hereby affirmed.